KATHY A.F. DAVIS (4022)
K. TESS DAVIS (15831)
Assistant Attorneys General
Utah Attorney General's Office
J. SHEA OWENS (15699)
Special Assistant Attorney General
DEREK E. BROWN (10476)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
kaitlindavis@agutah.gov
sowens@utah.gov
Tel: (801) 537-9801

*Attorneys for Plaintiffs*

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH, SEVIER COUNTY, and PIUTE COUNTY,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE; and MICHAEL T. ELSON, in his official capacity as FOREST SUPERVISOR, FISHLAKE NATIONAL FOREST,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Case No. _____** |

Plaintiffs, the State of Utah ("State"), Sevier County, and Piute County ("Counties"), by and through counsel, file this Complaint for Declaratory and Injunctive Relief against the Defendant, the United States Forest Service ("USFS") and Michael T. Elson, in his official capacity as the Fishlake Forest Supervisor. The USFS has failed to take the mandatory "hard look" at the full environmental effects of implementing the Southern Monroe Mountain

Allotments Livestock Grazing Authorization. Primarily, but among other flaws, the Defendant changed livestock grazing authorizations and permits in order to better comply with what it knew to be improper sage grouse standards. Specifically, the USFS was aware that a seven-inch droop height standard ("seven-inch rule") for sage-grouse habitat had been scientifically disproven, yet it still modified grazing permits to better comply with this errant "seven-inch rule." In so doing, the USFS violated the National Environmental Policy Act ("NEPA") and the Administrative Procedures Act ("APA") by disregarding sound scientific information and using discredited data to justify its decision.

## IDENTIFICATION OF FINAL AGENCY ACTION

1.      Plaintiffs bring this action against the Defendant for failing to consider relevant and available information in reissuing livestock grazing permits on the southern half of Monroe Mountain in the Fishlake National Forest in Utah.

2.      Defendant, the USFS, manages the Fishlake National Forest ("Forest") in Utah.

3.      Defendant manages wildlife habitat within the Forest and authorizes livestock grazing within the Forest.

4.      On September 9, 2020, the USFS issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS") for the Southern Monroe Mountain Allotments Livestock Grazing Authorization project which was published in the Federal Register (FR Doc. 2020-19955) ("Monroe Mountain EIS" or "EIS").

5.      On January 2, 2024, Forest Supervisor Mike Elson signed a Final Record of Decision for the Southern Monroe Mountain Allotments Livestock Grazing Authorization (58779) ("Final ROD"). The State and Counties challenge this decision.

6.      The purpose of the Monroe Mountain EIS was to consider whether and how to

authorize livestock grazing on the Dry Lake, Forshea, Kingston, Koosharem, Manning Creek, and Rock Springs Allotments in a manner that maintains or improves natural resource conditions consistent with Forest Plan Standards, guidelines, and objectives. *See* Final EIS at 1.

7.      One issue the USFS evaluated in the EIS was whether implementation of livestock grazing may result in adverse impacts on greater sage-grouse and greater sage-grouse habitat. *See* Final EIS at 95.

8.      The EIS identified a single population of sage-grouse that occurs in the planning area on the Kingston and Forshea Allotments. *See* Final EIS at 185 and Final EIS map 17.

9.      In 2015, the Fishlake National Forest Land and Resource Management Plan ("LRMP") incorporated habitat standards for greater sage-grouse, including a standard known as the "seven-inch rule." This LRMP came on the heels of the U.S. Fish and Wildlife Service ("USFWS") issuance of a listing decision for the greater sage-grouse species.

10.      In its 2015 listing decision for the greater sage-grouse species, USFWS determined that livestock grazing is a compatible use with sage-grouse and was not considered a range-wide threat to the species. Notice of 12-month petition finding, 2015-24292 (80 FR 59858), October 2, 2015.

11.      However, USFWS determined that livestock grazing could have the potential for negative impact at small local scales when improper grazing management occurs.

12.      Also in 2015, presumably in coordination with the listing decision, the Bureau of Land Management ("BLM") and the USFS developed land-use and resource management plan amendments for sage-grouse.

13.      Although the listing decision determined that livestock grazing and sage-grouse were compatible, further regulating livestock grazing became a prominent management issue

addressed in the USFS resource management plan amendments.

14.    The livestock management concerns in relation to sage-grouse habitat management included the possibility that livestock may eat the grass that sage-grouse utilize for cover. Because grass is only consumed incidentally by sage-grouse, and usually in very small amounts, there is no concern over competition for food. The concern, rather, is that livestock may eat the grass while sage-grouse may be using it for cover. Land managers felt that livestock foraging may reduce grass cover to a point that it negatively impacts sage-grouse.

15.    To date, various guidelines germane to this issue have been proposed and/or implemented by academics, as well as by State and Federal agencies.

16.    For example, in 2000, a group of scientists, using the published information on sage-grouse habitat characteristics available at the time, published a set of sage-grouse habitat guidelines that were meant to be implemented range-wide ("2000 Guidelines"). Connelly, J. W., M.A. Schroeder, A.R. Sands, and C. E. Braun. 2000. Guidelines to manage sage grouse population and their habitats. Wildlife Society Bulletin 28:967-985.

17.    The 2000 Guidelines included recommendations for the height of grasses during breeding, summer, and winter seasons. Most notably, these guidelines included a seven-inch grass droop height recommendation during the breeding period, or when sage-grouse females are nesting.

18.     These academic guidelines spoke to the management concern of livestock foraging impacts on greater sage-grouse habitat and cover. As a result, federal land management agencies increasingly began to manage for sage-grouse nesting habitat, and because of the 2000 Guidelines, the seven-inch rule began to emerge as a common standard for related policy and planning efforts.

19.     However, there has been uncertainty about the seven-inch rule from the beginning. Connelly, *et al.* only reported one study in Oregon that found grass height of seven inches or more to be positively correlated with nest survival. *Id.* Despite this uncertainty, in 2015 many federal plans — including the Fishlake LRMP — adopted a plan amendment that included the seven-inch droop height requirement/guideline for grasses in sage-grouse nesting areas.

20.     Consequently, many national forests now manage livestock grazing practices to comply with the seven-inch rule adopted through their forest plan amendments.

21.     The question of grass height and its impacts on sage-grouse nesting was not a new one. Long before the 2015 listing decision or the 2015 plan amendments, experts were questioning how grass height changes during the nesting period, and what impact those changes might have on nest survival analyses reviewed by Connelly, *et al*. in producing the 2000 Guidelines.

22.     The only study that Connelly, *et al.* reported on did not account for the change in grass height during the 37-day nesting period.

23.     It takes approximately 37 days from the time a hen selects a nest site in late April and early May until the time the eggs in the nest hatch. During these 37 days, grass height in most areas changes dramatically.

24.     As explained by Dr. David Dahlgren and Dr. Eric Thacker,

Most of the previous sage-grouse nest survival studies measured grass height at the time of nest fate; *i.e.,* when the hen stopped incubating the nest due to predation, abandonment, or the eggs hatching. Predation and abandonment events naturally occur earlier than hatching during the lifetime of a nest; therefore, if grass height is measured earlier in the nesting period[,] grass would be shorter than at nests that eventually hatched. Therefore, some researchers began to question if an inherent bias in grass height measurements was unintentionally included in the past nest survival analyses.

*Livestock Grazing and Sage-Grouse: Science, Policy, and the 7-inch Rule.* Dahlgren *et al*.

25.    Dr. Dahlgren and Dr. Thacker provided a visual chart to illustrate the inherent bias in grass height measurements.



*Figure 4. A simple demonstration of how sampling bias affected grass height measurements within past nest survival studies. In this graphic time is represented horizontally increasing from left to right, demonstrating the seasonal growth of grasses over time. The solid lines represent when most studies completed vegetation sampling to obtain grass heights. The dashed line represents when an unsuccessful nest "would" have had the grass measured if it had been successful.*

26.    Additional research confirmed that this bias existed, demonstrating the impact of the bias on the survival analyses. *See, e.g.* Gibson, D., E. J. Blomberg, and J.S. Sedinger. 2016. Evaluating vegetation effects on animal demographics: the role of plan phenology and sampling bias. Ecology and Evolution 6:3621-3631. DOI: 10.1002/ece3.2148. The Gibson study measured failed nest sites both at the time of failure and at the estimated date when the nest would have hatched had it not failed. The study also measured successful nests at the time of hatch, as in past studies. This proved that the supposed relationship between grass height and nest success did not exist; rather, it was a product of the inherent bias in the timing of vegetation measurements, thus debunking the seven-inch droop height rule for sage-grouse nesting management. Other researchers arrived at the same conclusions. *See, e.g.*, Smith, J. T., J. D. Tack, K. E. Doherty, B. W. Allred, J. D. Maestas, L. I. Berkeley, S. J. Dettenmaier, T. A. Messmer, and D.E. Naugle.

2017. Phenology largely explains taller grass at successful nests in greater sage-grouse. Ecology and Evolution 8:356-364. DOI: 10.1002/ece3.3679.

27.    The current research exposes the inherent bias of the study relied upon by Connelly, *et al.* to produce the seven-inch droop height guideline. However, many forests still have the seven-inch rule in their forest resource management plans.

28.    In fact, even more recent research conducted by the University of Idaho over the span of ten years "shows that cows sharing nesting habitat with grouse on federal lands has no influence on nest success of greater sage grouse if grazing intensity is kept at current levels. In fact … there are upshots for grouse living alongside cows. Having bovines on the land results in a greater abundance of insects, especially in the spring, when chicks rely on bugs for food." Ralph Bartholdt. *Stepping Lightly in the Sage: Researchers Learn Moderate Grazing Has No Effects on Sage Grouse Nest Success*. (2023). Available online: https://www.uidaho.edu/news/feature-stories/sage-grouse-ten (last accessed January 21, 2025).

29.    The USFS was and is aware that the seven-inch grass height rule had been debunked, and that managing for a seven-inch standard is not in line with the best available science, nor is cattle grazing directly detrimental to sage-grouse nesting success.

30.    Some of the best available science on this matter, specific to Utah and this region, comes from Utah State University and its researchers. Their research has determined that a proper grass stubble height at the end of the nesting season is between four and six inches.

31.    The USFS was aware of this local data because the State of Utah, in its role as a Cooperating Agency ("CA") and as part of the Interdisciplinary Team ("ID Team"), as well as universities and other interested stakeholders, provided this data to the Fishlake Forest Service on multiple occasions.

32.     The State of Utah shared this information with the ID Team through email exchanges on March 29, 2021. *See* Exhibit G.

33.     The State of Utah discussed this information with the ID Team in several meetings early in the planning process.

34.     The State of Utah again provided to the USFS the local data, as well as the information that debunked the seven-inch grass height rule[1], as part of its administrative review of the draft EIS.

35.     The State of Utah again provided this information to the USFS as part of the objection process related to the Final EIS.

36.     Upon information and belief, the Forest Service specialists were aware of the flaws in the seven-inch rule and the State's data about proper stubble heights independently from this project as the State and Federal government have been working constantly and cooperatively toward proper sage-grouse management in the State for roughly the last fifteen years.

37.     The USFS had multiple opportunities to accept the sage-grouse data and information provided by the State and make the requisite changes, but it chose not to.

38.     The Fishlake USFS has ignored the research that debunked the seven-inch grass height rule and continues to manage under the 2015 LRMP amendment that requires a seven-inch grass droop height for sage-grouse.

39.     The Fishlake USFS has also ignored the local research and published science that specifically addresses the proper grass stubble heights for this region.

40.     The USFS cannot argue that it ignored this information because it was outside the scope of the EIS. The USFS indeed evaluated in this EIS the effects of livestock grazing on sage-

---

[1] Exhibit H

grouse habitat, including the effects of livestock grazing on compliance with a seven-inch grass droop height standard. Accordingly, the seven-inch grass droop height standard was squarely within the scope of the EIS.

41.    The USFS indicated to the State and Counties that its national team is considering changes to the Sage Grouse plan and those changes will be included in the Fishlake LRMP if and when they occur. Here, the USFS's response to the State's request to utilize the best available science is insufficient. The USFS did not need to adopt a new standard for sage-grouse habitat management through its national team, it needed only to recognize that the seven-inch grass droop height standard is improper and cease to manage for compliance with that standard.

42.    Further, the USFS's response here suggests that the USFS is aware of the error but simply does not wish to address it.

43.    The USFS violated NEPA by ignoring the illegitimacy of the seven-inch rule in the face of substantial research and data to the contrary which was provided on the topic. This violation is particularly egregious because not only did the USFS ignore the illegitimacy of the standard, it also implemented authorization decisions aimed at improving compliance with the illegitimate seven-inch standard.

44.    Specifically, the USFS used this seven-inch standard as a justification to deny an Animal Unit Month ("AUM") increase, and to shorten the grazing season under the terms of the grazing permit for the Kingston/Forshea Allotment.

45.    Further, the USFS also ignored the current and best available science on the subject matter. The State of Utah had been studying stubble heights for sage-grouse nesting and submitted its findings and conclusions as to the desired stubble heights for sage-grouse nesting to the USFS and to the ID Team working on this grazing authorization plan.

46.    The best available science, which was provided to the USFS, indicated that the proper stubble height for sage-grouse nesting in this region was between four and six inches. There were extensive studies done on sage-grouse habitat near the project area, and that data suggested that the stubble height needed was closer to four inches.

47.    Again, this data was provided by the State of Utah to the USFS early in the planning process but was not given proper consideration. There is no mention of the more updated data in the EIS.

48.    The refusal by the USFS to properly consider the provided data concerning sage-grouse minimum stubble heights required for nesting is not the only example of the USFS refusing to consider the best available science and data.

49.    Through a $400,000 legislative appropriation, the State of Utah, in coordination with Piute and Sevier Counties, retained an environmental consulting firm — Stager's Environmental Consulting ("SEC") — to conduct an independent rangeland health study on the allotments affected by the Monroe Mountain EIS. As part of that independent analysis, the hired firm was to gather rangeland cover data and species diversity data, to identify species that are preferred and needed by sage-grouse, and to identify the presence of high palatability forbs for sage-grouse as well as observing the apparent trend of plant communities and soil conditions.

50.    Additionally, the consulting firm collected detailed riparian proper functioning condition assessments, which exposed the widespread beaver exodus from the analysis area and provided supportable cause and effect for that exodus. The Counties provided this data and issue identification to the USFS in comments and objections to the EIS, as well as through field trips and meetings with USFS management and staff. Also provided to the USFS was a report issuing the 2021 findings, which also included the updated data from the 2022 upland and riparian

evaluations ("First SEC Report").

51.     Concerning the rangeland conditions, the raw data collected by SEC, as well as the first SEC report, showed that the current management of the rangeland was adequate. The data confirmed that the vegetation in the areas monitored was healthy, diverse, provided appropriate ground cover, and was predominantly in stable or upward trends.

52.     The report and comments provided to the USFS also exposed the USFS's flaw in managing rangeland health through utilization determinations. The report confirmed that utilization and stubble height are not proper tools for determining rangeland health.

53.     In addition to the rangeland data, the environmental consultants also provided illuminating riparian data to the State, Counties, and USFS. The scientific report and raw data revealed that the majority of riparian areas evaluated and/or traversed were functioning in proper condition. However, these riparian areas were also transitioning from a beaver dam-controlled stream — which slows down water and disperses it further out into the meadow — to a cobbled/boulder/sanded gravel stream in which the water is restricted to a stream channel, resulting in a smaller riparian area.

54.     The report explained that this transition in stream type is a direct result of the recent beaver exodus on Monroe Mountain. As the beavers leave, the beaver dams become unmaintained. As the dams wash out, depending on location, the stream channel gets smaller and transitions into a more restrictive stream channel with cobbles, boulders, or sand and gravel on the bottom. And with a restricted stream channel, the riparian areas shrink as well.

55.     Again, the information provided through raw data and a scientific report regarding riparian conditions and rangeland conditions was not properly considered by the USFS. It is unclear what data the USFS used to determine that riparian areas were not meeting standards, but

regardless, the data would be questionable because it ignored the natural change in the riparian potentials that occurred as a result of the beaver exodus.

56.    Given that the changing of potential was not considered by the USFS, it was improper to rely on traditional riparian widths associated with streams controlled by beaver dams, rather than the narrower riparian areas associated with restricted stream channels when evaluating riparian conditions.

57.    This failure to examine and utilize the new data, the findings, and the significant resource issues provided led the decision makers to rely on flawed and unsupportable information when making determinations and decisions regarding how and when to authorize grazing on Monroe Mountain.

58.    Specifically, the USFS determined that several riparian areas in the Dairies Pasture were not meeting standards (standards not based on real resource issues) and implemented a six-inch stubble height requirement for the entire pasture to protect those riparian areas.

59.    However, the data and report provided to the USFS concluded that if the streams were evaluated properly, considering their transition, the riparian areas would be considered functional and in good condition and there would be no cause for change in standard from four inches to six inches.

60.    The State and Counties bring this lawsuit against the USFS because it failed to adhere to the best available science when developing this grazing plan as required by law.

## JURISDICTION AND VENUE

61.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question); 28 U.S.C. § 2201 (declaratory judgment); the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321-35; and the federal Administrative Procedures Act ("APA"), 5

U.S.C. § 706.

62.     The APA also authorizes judicial review of Defendant's actions because the

Defendant has acted contrary to law, 5 U.S.C. § 706(2)(C), and arbitrarily, capriciously, and not

in accordance with law. 5 U.S.C. § 706(2)(A).

63.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the lands

considered for grazing reauthorization are located entirely within the State of Utah.

<u>**PARTIES**</u>

64.     The State of Utah is one of fifty sovereign states forming the United States of

America, having been admitted to the Union on January 4, 1896, on an equal footing with the

original states. 28 Stat. 107, (July 16, 1894).

65.     Plaintiff Piute County is a political subdivision of the State of Utah, located in the

south-central part of Utah. The southern Monroe Mountain, specifically the six allotments

considered in this decision, lie wholly or partially within the borders of Piute County. The Piute

County commissioners exercise governmental authority for and on behalf of Piute County

pursuant to state law. As a political subdivision of the State of Utah, Piute County, acting

through its county commissioners, is duly vested with governmental power and authority to

provide for and protect the public health, safety, and welfare of its citizens and those who work,

recreate, and travel within its boundaries.

66.     Plaintiff Sevier County is a political subdivision of the State of Utah, located in

the south-central part of Utah. The southern Monroe Mountain, specifically the six allotments

considered in this decision, lie wholly or partially within the borders of Sevier County. The

Sevier County commissioners exercise governmental authority for and on behalf of Sevier

County pursuant to state law. As a political subdivision of the State of Utah, Sevier County, acting through its county commissioners, is duly vested with governmental power and authority to provide for and protect the public health, safety, and welfare of its citizens and those who work, recreate, and travel within its boundaries.

67.     Defendant the United States Forest Service is a federal agency responsible for the management of National Forest System Lands in Utah. The United States Forest Service manages approximately 8.2 million acres of federal land in Utah, including the Fishlake National Forest, and specifically the six allotments USFS considered in the planning process at issue in this litigation.

## PLAINTIFFS' STANDING AND INTERESTS

68.     Plaintiffs the State of Utah and Piute and Sevier Counties have standing to bring this complaint in Federal Court.

## Standing

69.     The standing of the State and the Counties to assert their interests were validated in a similar case involving the same Monroe Mountain Allotments; *Western Watersheds Project ("WWP") v. United States Forest Service,* Case NO. 4:29-dv-00097-DN-PK (March 29, 2021, D. Utah), where the court held:

> The State and Counties assert sovereign interests in this litigation through the management of public lands, natural resources, recreational opportunities, and tax revenues associated with the land in question. Generally, the State and Counties assert an economic interest in livestock grazing on these lands, which provides direct and indirect contributions to both the State and Counties and to their local governments' revenues. Specifically, the State and Counties assert an interest in the range infrastructure and related projects they have funded on the Allotments. Additionally, the State asserts an interest in the use, management, and health of the lands within its borders—namely, its codified interest in the effective management of livestock and the management of wildlife on lands within its borders to protect the environment, the custom and culture, and the productivity of its agricultural industry. The State further asserts a real property interest because the land in question is used for the benefit of Utah's publicly-funded, state-managed school system, including

both grades K–12 and certain publicly-funded higher education institutions. Furthermore, the Counties assert an interest in protecting and preserving the livelihoods, cultural heritage, and pioneer traditions of ranchers, including the permittees, who live and operate in Piute and Sevier Counties

*Id.,* ECF 33 (footnotes omitted).

70.     The State of Utah and Plaintiff Counties have been injured by this decision in several ways. By failing to properly increase AUMs, by reducing the amount of time producers spend on the allotment, by changing riparian stubble height requirements, and by changing monitoring procedures, the decision diminishes the return on investment for the Plaintiffs on all of the money, in kind contributions, and infrastructure that the State and Counties have invested in this region to improve livestock production and wildlife habitat. Final ROD at 2-10.

71.     Additionally, by ignoring current science, this plan unnecessarily pits sage-grouse habitat against livestock foraging which impedes the State's ability to meet its stated goal of balancing livestock production and wildlife. *See* State Resource Management Plan at 17 (January 8, 2024), available at https://publiclands.utah.gov/community/resources-management-planning/.

72.     The State and Counties have also suffered procedural harm through the USFS's failure to comply with NEPA and incorporate the best available science as it relates to sage-grouse grass cover and the seven-inch rule. 40 C.F.R. §1500.1(b), § 1502.23. Furthermore, the State and Counties have suffered economic harm, as the amount of available forage yield for the livestock industry has diminished as a result of the USFS's decision.

73.     The Plaintiffs are injured, as both the State and Counties have expended hundreds of thousands of dollars in on-the-ground investments to improve the rangeland and wildlife habitat on Monroe Mountain through programs such as the Grazing Improvement Program ("GIP") and the Watershed Restoration Initiative ("WRI"). This included projects such as trough and pipeline systems to better disperse use away from sage-grouse habitat and better balance

wildlife and livestock uses. By implementing restrictive grazing measures in the Monroe

Mountain EIS, the USFS has jeopardized those investments, and the State and Counties have a

valid interest in protecting those investments.

74.    The Plaintiffs' injuries in this action also include a diminished ability to properly

manage wildlife within Utah's borders, specifically sage-grouse. By ignoring the Plaintiffs' sage-

grouse related plans, policies and guidelines, the USFS has caused the Plaintiffs to forfeit years'

worth of time, money and manpower directly related to the development of said plans, policies

and guidelines.

75.    The Plaintiffs are further injured as both the State and Counties have expended

hundreds of thousands of dollars and resources to obtain the most up-to-date and best available

rangeland health data on Monroe Mountain. The USFS's decision to ignore the valuable

information and data generated by the expenditure of these resources results in a direct loss to

both the State and Counties.

76.    The Plaintiffs are further injured as the Monroe Mountain EIS restricts livestock

producers' ability to properly utilize available forage, and with less forage available for

livestock, the Plaintiffs suffer economic harm to their agriculture-reliant economies.

77.    These injuries are fairly and directly traceable to the USFS's livestock grazing

authorization decisions contained in the Monroe Mountain EIS. That decision ignored sage-

grouse specific habitat requirements developed through millions of dollars and hundreds of

thousands of hours of State resources. It also reduced the amount of available forage for

livestock by reducing utilization criteria and increasing stubble height requirements in the face of

scientific evidence showing no need for such a change.

78.    These injuries may be redressed by an order from this Court setting aside and

remanding the decision back to the USFS and requiring them to consider the sage-grouse specific

habitat information provided to them by the State, as well as the rangeland and riparian

conditions information provided to them by the Plaintiffs.

**Cooperating Agencies**

79.    The Plaintiffs have special expertise in the planning subject matter and

jurisdiction in this planning area which qualified them to participate as a Cooperating Agency in

the planning process.

80.    The Plaintiffs participated in the planning process leading up to the final decision

through involvement as a Cooperating Agency and by attending interdisciplinary team meetings,

attending Cooperating Agency meetings, providing information relevant to the plan, and

submitting comments on drafts. 43 C.F.R. 4.410(b).

81.    The State of Utah and the Fishlake National Forest executed a memorandum of

understanding ("MOU") specifically to establish and define a Cooperating Agency relationship

between them to prepare a grazing reauthorization plan for southern Monroe Mountain.

82.    The MOU expressly acknowledged that the State of Utah, through its Public

Lands Policy Coordinating Office ("PLPCO") as a Cooperating Agency, has special expertise

applicable to livestock production and management, wildlife management, and state public land

and environmental policies, among other expertise, as defined in 40 CFR 1508315 and 1508.26.

83.    PLPCO actively participated in the planning process for this grazing plan and

submitted comment letters on behalf of the State.[2] These letters articulated the State's and

Counties' interests and positions on matters relating to the proposed plan.

84.    Both Plaintiff Counties also participated throughout the entire planning process as

_____

[2] See State Letters dated Feb. 22, 2022, Oct. 26, 2020, March 19, 2021, and June 20, 2023
attached as Exhibits A – D to this complaint.

Cooperating Agencies and submitted various reports, letters, and other correspondence articulating the Counties' interests and positions on matters relating to the Monroe Mountain EIS.

85.     The USFS must consider relevant information provided to them by Cooperating Agencies during the planning process, but for all intents and purposes, the data and information provided to the USFS by the State and Counties (particularly relating to sage-grouse) was largely ignored.

**Wildlife Interests**

86.     The United States Supreme Court has long recognized that states as sovereign entities have the power and right to control and manage wildlife within their borders. *Greer v. Connecticut,* 161 U.S. 519 (1896). This state ownership doctrine is a legitimate basis for the exercise of state authority.

87.     Pursuant to Utah Code Annotated § 23-13-3, all wildlife within the State of Utah is the property of the State. The State has primary responsibility for the management of wildlife within its borders and receives economic benefits from the issuance of hunting and fishing licenses and permits to outdoor sportsmen. *See generally* UDWR, Fiscal Year 2020 Financial Information, Utah Division of Wildlife Resources, *available at*: https://wildlife.utah.gov/dwr-financial-overview.html.

88.     Over the course of the past decade, the State of Utah has spent more than $183 million on the protection of sage-grouse to conserve the species and prevent federal listing. State Resource Management Plan at 156.

89.     According to the Utah Office of Energy Development, a federal listing of sage-grouse as endangered could cost the state more than $41.4 billion in lost economic development.

*Id.*

90.     In Utah, expenditures on wildlife-related recreation totaled $1.87 billion, with $701 million spent on wildlife watching. *Id.* at 187-88.

91.     The State of Utah's official policy is to "[m]anage species in need of conservation based on the best available, site-specific, biological, and social scientific knowledge and information." *Id.* at 157. And to "[b]ase all actions taken under the ESA on the best scientific information available." *Id.* Further, one of Utah's objectives in wildlife management is to "[u]tilize the best available science and wildlife management techniques to manage wildlife populations throughout Utah." *Id.*

92.     The USFS's decision to implement a sage-grouse standard that is unsupported by the best available science, and that has been disproven as a management standard, significantly diminishes the value of the scientific data generated by State resources. It further impedes the State's ability to comply with its own laws and regulations that require wildlife to be managed by the best available science. It also creates an unnecessary conflict between two vital state interests: wildlife management and livestock grazing.

93.     The State has spent millions of dollars to study sage-grouse and their needs. When the USFS unilaterally ignores that data, as it has done here, it deters the State from investing in wildlife studies and diminishes the ability of the State to control and manage its wildlife.

94.     This contrived conflict between wildlife and livestock negatively affects the State of Utah's ability to manage both a healthy wildlife network and a strong agricultural economy.

**Livestock Grazing and Agriculture interests**

95.     The State as a sovereign has an interest in seeing its laws applied with respect to grazing on federal public lands, including grazing in the Fishlake National Forest.

96.     State law declares that "livestock grazing on public lands is important for the proper management, maintenance, and health of public lands in the state." Utah Code Ann. §4-18-102(4).

97.     Utah has codified that "[l]ivestock and grazing in Utah is important for the natural, cultural, social, and economic benefits it provides. [...] The State of Utah considers agriculture a large part of its history, custom, and culture." State Resource Management Plan at 99.

98.     In furtherance of these stated goals and objectives, the State of Utah has established Agricultural Commodity Zones (of which these six allotments are a part) for the purpose of:

> (a) Preserving and protecting the agricultural livestock industry from ongoing threats; (b) preserving and protecting the history, culture, custom, and economic value of the agricultural industry from ongoing threats; and (c) maximizing efficient and responsible restoration, reclamation, preservation, enhancement, and development of forage and watering resources for grazing and wildlife practices and affected natural, historical, and cultural activities.

> Utah Code Annotated 63J-8-105.8(1).

99.     Further, Utah has adopted the objective to uphold "practices that optimize and expand forage for grazing and wildlife." *Id.* at 103. It is further the policy of the State to "[s]upport the use of the best-available science to establish grazing AUM/HM levels." *Id.*

100.    The State derives an economic benefit from the continuation of livestock grazing on federal public lands, including livestock grazing in the Fishlake National Forest.

101.    Agriculture, and more particularly livestock grazing, is a key piece of the overall economy of the State. For example, farm business income in Utah produces over $3.3 billion in cash receipts per year. *See* Headwaters Economics. 2023. Economic Profile Systems: Agriculture. Available online: https://headwaterseconomics.org/apps/economic-profile-system/

(last accessed January 20, 2025).

102.    In Piute County, Utah, agriculture plays an even more essential role in the overall economic health of the county. For example, in Piute County, agricultural employment constituted 22 percent of all jobs (compared to 1.2 percent nationwide) and produced 68.3 percent of total earnings in the County as of 2023; expressed in dollars, farm business income in Piute County produces over $77.3 million in cash receipts per year. *See* Headwaters Economics. 2023. Economic Profile Systems: Agriculture. Available online:

https://headwaterseconomics.org/apps/economic-profile-system/ (last accessed January 20, 2025).

103.    In Sevier County, Utah, the economic impact of agriculture is very similar. In Sevier County, agricultural employment constituted 5.4 percent of all jobs (compared to 1.2 percent nationwide) in 2023; expressed in dollars, farm business income in Sevier County produces over $160.8 million in cash receipts per year. *See* Headwaters Economics. 2023. Economic Profile Systems: Agriculture. Available online:

https://headwaterseconomics.org/apps/economic-profile-system/ (last accessed January 20, 2025).

104.    Delving into the livestock impact on the overall agriculture market in Utah, the most recent Census of Agriculture completed by the United States Department of Agriculture ("USDA") revealed that, of the total agricultural cash receipts in the State of Utah, the sale of cattle and calves account for $427.5 million. *See* 2022 Census of Agriculture. 2022 State Profile: Utah, Table 13. Available online:

https://www.nass.usda.gov/Publications/AgCensus/2022/Full_Report/Volume_1,_Chapter_1_State_Level/Utah/ (last accessed January 20, 2025).

105.    Further, of the total agricultural cash receipts in the State of Utah, the sale of sheep and lambs accounts for $802,000. *See* 2022 Census of Agriculture. 2022 State Profile: Utah, Table 27. Available online:

https://www.nass.usda.gov/Publications/AgCensus/2022/Full_Report/Volume_1,_Chapter_1_State_Level/Utah/ (last accessed January 20, 2025).

106.    According to the same census data, the sale of cattle and calves in 2022 for the Counties of Piute and Sevier totaled $8,471,000 and $42,675,000 respectively. *See* 2022 Census of Agriculture. 2022 County Level Data -Utah, Table 11. Available online:

https://www.nass.usda.gov/Publications/AgCensus/2022/Full_Report/Volume_1,_Chapter_2_County_Level/Utah/ (last accessed January 20, 2025).

107.    Similarly, the sale of sheep and lambs for the Counties of Piute and Sevier totaled $611,000 (2017) and $392,000 (2022) respectively. *See* 2022 Census of Agriculture. 2022 County Level Data -Utah, Table 13. Available online:

https://www.nass.usda.gov/Publications/AgCensus/2022/Full_Report/Volume_1,_Chapter_2_County_Level/Utah/ (last accessed January 20, 2025).

108.    These dollar amounts, expressed above as percentages of farm employment and cash receipts of both livestock production and agriculture as a whole, underscore one important detail: agriculture and livestock grazing play a key role in Utah's overall economy and play an even greater role in the economic health of the Plaintiff Counties.

109.    More pointedly, because there is insufficient private land in the State and Counties to solely support the livestock industry, public land grazing plays a vital role in ensuring the viability of Utah's livestock grazing industry.

110.    Of the 45,000,000 acres of grazing lands within the state of Utah, 73 percent are

federally owned, 9 percent are state owned, and only 18 percent are privately owned. *See* Utah

State Resource Management Plan at 22.

111.    In Piute County, the land tenure numbers are similarly lopsided, with about 74

percent federally owned and another 13 percent state owned, with the small remainder in private

holdings. *See* Devon Dewey, *Road to Understanding: Intergenerational poverty, public land*

*regulations worry Piute County officials*. KSL News. (2017). Available online:

https://www.ksl.com/article/43585580/road-to-understanding-intergenerational-poverty-public-

land-regulations-worry-piute-county-officials (last accessed January 20, 2025).

112.    With urbanization continually swallowing up available private agricultural lands

within the State, livestock grazing on federally administered land becomes increasingly

important to the survival of agriculture in the State of Utah, Piute County, and Sevier County.

113.    The economies of Piute County and Sevier County benefit enormously from

livestock grazing on federal grazing allotments within the Fishlake National Forest.

114.    While the Final Record of Decision ("Final ROD") does not reduce AUMs/HMs

on its face, various management prescriptions adopted by the Final ROD will reduce AUMs in

practice and encumber the permit holders with economically burdensome compliance

requirements.

115.    The decision to move from an end-of-season utilization measurement to a real-

time measurement will reduce the amount of forage available for livestock and cause producers

to leave pastures earlier and ultimately leave the mountain before they can make full use of the

AUMs and their allotments.

116.    The decision to move from a four-to-six-inch stubble height to a six-inch stubble

height in the Dairies pasture will reduce the amount of forage available for livestock and not

allow the producers to make full use of the authorized AUMs or the allotments.

117.   These two prescriptions alone will reduce AUMs in practice and negatively affect the agriculture economy of Plaintiff Counties and the State of Utah.

118.   Further, the USFS's failure to adhere to the best available science, and instead following disproven management standards, creates a conflict between livestock and wildlife that does not actually exist. Implementing management decisions to mitigate this nonexistent conflict impedes the Plaintiffs' ability to properly balance livestock and wildlife resources.

119.   Specifically, the USFS made two management decisions to mitigate this nonexistent conflict that negatively affected the Plaintiffs. First, the USFS changed the "on date" from June 6 to June 16; second, it refused to allow for an AUM increase on the Kingston/Forshea allotment. Both of these decisions were made to mitigate a nonexistent conflict between sage-grouse habitat and livestock foraging.

120.   State law therefore supports the Plaintiffs' interest and standing to challenge the USFS final decision by this action.

## STATUTORY AND REGULATORY FRAMEWORK

### The National Environmental Policy Act

121.   Congress enacted NEPA to "encourage the enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate health and welfare of man; to enrich the understanding of the ecological and natural resources important to the nation . . ." 42 U.S.C. § 4321.

122.   To achieve these goals, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

123.    The EIS must "provide a full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. This open process of evaluation allows all stakeholders to know the implications of federal actions and to have the ability to participate and have their voices heard in the decision-making process.

124.    NEPA requires that the information an agency uses in conducting its environmental review be "of high quality," and agencies "must ensure the professional integrity, including scientific integrity," of their discussion and analyses. *Id.* at §§ 1500.1(b) and 1502.23. "Agencies shall make use of reliable existing data and resources." *Id.* at § 1502.23.

125.    The purpose of NEPA's procedural requirements is to mandate that agencies take a "hard look" at all environmental impacts and risks of a proposed action. *See Natural Res. Def. Council v. Morton*, 458 F.2d 827, 383 (D.C. Cir. 1972). This review cannot be superficial, but rather agencies must take this "hard look" in light of comments submitted by the public as well as high-quality scientific information. *Id.*

**Administrative Procedures Act.**

126.    Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations. The APA also establishes a process for judicial review of agency action.

127.    Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment. 5 U.S.C. § 553.

128.    The APA also establishes a procedure for judicial review for those who are suffering harm as the result of final agency action and have no other adequate remedy. *Id.* at §

704.

129.    The reviewing court may decide "all relevant questions of law, interpret

constitutional and statutory provisions, and determine the meaning or applicability of the terms

of an agency action." *Id.* at § 706.

130.    The court shall, among other things, "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . Arbitrary, capricious, or otherwise not in accordance

with law; […] In excess of statutory jurisdiction, authority, or limitations, or short of statutory

right … [or] without observance of procedure required by law." *Id.* at § 706(2)(A) and (C)-(D).

131.    Defendant USFS issued the decision in question here; the Final ROD is therefore

subject to judicial review at this time.

**The 2012 Forest Service Planning Rule**

132.    On April 9, 2012, USFS issued a National Forest Systems Land Management

planning rule to guide the "collaborative and science-based development . . . of land

management plans. . ." 36 C.F.R. § 219.1(c).

133.    The purpose of the 2012 Planning Rule is to guide the "collaborative and science-

based development . . . of land management plans. . ." 36 C.F.R. § 219.1(c).

134.    The 2012 Planning Rule mandates that the responsible official shall use the best

available scientific information to inform the planning process. *Id.* at § 219.3.

135.    The responsible official shall determine what information is the most accurate,

reliable, and relevant to the issue being considered. *See id.*

136.    "Such documentation must: Identify what information was determined to be the

best available scientific information, explain the basis for that determination, and explain how

the information was applied to the issues considered." *Id.*

## FACTUAL ALLEGATIONS

137.    The Plaintiffs incorporate by reference each paragraph above.

138.    Monroe Mountain has been the subject of much attention over the last decade. Most of this attention has been surrounding the livestock grazing that occurs in the six allotments that are subject to this decision.

139.    Several of these allotments have been the subject of legal challenges. In November 2019, Western Watersheds Project ("WWP") sued the USFS over the management of the Kingston, Forshea and Manning Creek allotments.

140.    That lawsuit resulted in a Settlement Agreement between USFS and WWP, signed on November 30, 2021.

141.    As part of that agreement, the USFS committed to requiring permit holders to use riders to keep livestock away from sage-grouse leks until after June 16 annually, until this grazing decision was signed. The USFS also agreed to perform certain monitoring and to pay some attorney fees. *See* Settlement Agreement, attached as Exhibit F.

142.    Most of the conflicts on Monroe Mountain stem from a change in the type of livestock that occurred in the 1990s on the Forshea allotment. Unfortunately, this EIS did nothing to address that conflict.

**Conversion from Sheep to Cattle on the Forshea Allotment.**

143.    Livestock (mostly sheep and cattle) have been grazed on all six allotments relevant to this planning effort since the early 1900s.

144.    Grazing authorization has traditionally been, and continues to be, quantified in Animal Unit Months ("AUMs") which is "the amount of dry forage required to sustain a 1,000-pound cow for one month[.]" Bedel, Thomas E. 2005. Society for Range Management. Glossary

of terms used in Range Management, 4th Ed. Dener, Colorado: Society for Range Management. *See also* FEIS at 9. The amount of forage "consumed by a cow changes as forage quality changes. AUMs have been commonly standardized at 750 pounds of forage because a 1,000-pound cow consuming 2.5 percent of her body weight equivalent per day for a month is equal to about 750 pounds." Barton Stam, John Derek Scasta, Eric Thacker, *Animal Unit Month (AUM) Concepts and Applications for Grazing Rangelands,* University of Wyoming Extension, *available at:* https://wyoextension.org/publications/html/B1320/ (2018).

145.    Typically, the Bureau of Land Management ("BLM") uses the term "AUM," whereas the USFS uses the term "Head Month" or "HM" to describe the same amount of forage. In practice, the terms are interchangeable. *See* USFS, *United States Department of Agriculture Forest Service 2022 Prospectus for Cattle Grazing on Allotments E2, E3, E4, E5, E8, E9, E11, E12, E13, W1 Midewin National Tallgrass Prairie Illinois*, U.S. Department of Agriculture, *available at:* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd961563.pdf (2022). According to the USFS grazing regulations, "a head month is a month's use and occupancy of range by one animal, except for sheep or goats." 36 CFR § 222.50(c).[3]

146.    AUMs or HMs can be converted between different species by using what is known as "Animal Units" ("AUs") and "Animal Unit Equivalents" ("AUEs"). In short, "Animal unit equivalents (AUE) have been developed to standardize grazing demand among different herbivore species. An AUE expresses the quantitative forage demand of a particular kind and class of animal relative to that of an animal unit, based primarily on metabolic bodyweight." The Rangelands Partnership, *Animal Unit Equivalents,* Rangelands Gateway, *available at*: https://rangelandsgateway.org/inventorymonitoring/unitequivalents (2023).

---

[3] Because the two terms AUM and HM describe the same amount of forage, and are (generally speaking) interchangeable, any reference in this Complaint to AUMs applies to HMs as well.

147.    The table below shows the suggested AUE for various herbivores, as outlined by

The Rangeland Partnership. *Id.*

| Suggested Factors Describing Animal Unit Equivalents for Various Herbivores | |
|---|---|
| **Type of Herbivore** | **Animal Unit Equivalents** |
| Mature Cow, Non-Lactating | 1.0 |
| Sheep, Mature, Non-Lactating | 0.2 |
| Ewe and Lamb Pair | 0.3 |
| Saddle Horse, Mature | 1.25 |
| Elk, Mature | 0.65 |
| Mule Deer, Mature | 0.23 |
| Whitetail Deer, Mature | 0.17 |
| Antelope, Mature | 0.17 |

Fig. 2:
Suggested AUE for Various Herbivores (The Rangeland Partnership).

148.    As highlighted by the table above, one mature cow is the equivalent of one AU,

while a mature sheep is the equivalent of 0.2 AUs. Thus, if a pasture has a carrying capacity of

100 AUMs/HMs, then a livestock producer could graze either 100 cows for one month or 500

sheep for one month. Essentially, according to the table above, when converting available forage

from cattle to sheep, the producer would simply multiply the number of cattle by five, and this is

the number of sheep sustainably supported by the same amount of forage.

149.    The USFS does not use this exact method of AUE/HM computation across the

herbivore spectrum; however, in terms of comparing sheep HMs with cattle HMs, the USFS regulations do state that "for fee purposes 5 sheep or goats, weaned or adult, are equivalent to one cow, bull, steer, heifer, horse, or mule." 36 CFR § 222.50(c). Thus, consistent with the Rangeland Partners AUE table and the USFS grazing regulations, for a direct conversion of cattle HMs to sheep HMs, a multiplier of five would derive the appropriate number of sheep from cattle (or a division by five if converting from sheep to cattle).

150.    In 1992, the Forshea allotment was converted from sheep to cattle. *See* Final ROD at 50. Because the 1992 conversion did not use the five-to-one conversion rate described above, this particular conversion resulted in an erroneous decrease of 261 available AUMs/HMs. *Id.*

151.    At the request of the Permit Holders, the Forest Supervisor considered authorizing an immediate increase of 261 HMs for the Forshea allotment in the Final EIS to rectify the improperly calculated 1992 conversion. *Id.*

152.    Some of the impacts evaluated in considering whether to authorize the immediate increase were the "impacts to sage-grouse and recent sage-grouse habitat assessment framework data, *droop and stubble height information*, and utilization data." *Id.* (emphasis added).

153.    The USFS then went on to deny the request for an immediate increase based in part on the fact that in 2022, "on the Forshea allotment, the average droop height was 6 inches (less than the seven-inch criteria for sage grouse)." *Id.*

154.    At this point in the process, the USFS understood, or should have understood, that the seven-inch droop height criteria for sage-grouse had been debunked and was an improper management standard for sage-grouse habitat in this area. But the USFS used the standard nonetheless, and the allotment's failure to meet that standard, as a justification for not authorizing an immediate increase that would have rectified the improper HM conversion from

1992.

155.    The refusal to restore these lost HMs is directly tied to the USFS's reliance on
improper sage-grouse data and guidelines.

156.    Specifically, the USFS was aware, or should have been aware, that grass heights
from four to six inches provide sufficient habitat for sage-grouse nesting in this area of Utah.
Yet, the USFS still made livestock grazing authorization decisions as though a six-inch grass
height was insufficient cover for sage-grouse nesting.

157.    Had the USFS properly considered the best available science, it should have
granted some or all of the requested increases to AUMs/HMs for this allotment.

**Authorization of On and Off Dates**

158.    The LRMP sage-grouse amendments from 2015 identify three seasonal date
ranges for managing sage grouse habitat: Breeding and Nesting Season (March 1- June 15),
Brood-Rearing/Summer (June 16 – October 31), and Winter Use (November 1 – February 28).
*See* FEIS at 41, Table 13.

159.    Table 13 also lists the desired forest conditions for each of those date ranges. *Id.*
For the Breeding and Nesting season (March 1 – June 15), one of the desired conditions is a
seven-inch height on upland perennial grasses. *Id.*

160.    The June 15 date and the seven-inch desired condition are important because
traditionally, the USFS has permitted cattle to turn out on the Kingston and Forshea allotments
on June 6. That is nine days before the breeding and nesting seasons end.

161.    In the Final ROD, the USFS elected to change the "on date" for the
Kingston/Forshea allotment from June 6 to June 16. The justification for this change was to
"facilitate more certain compliance with sage grouse LRMP guidance and to help reduce impacts

to sage grouse and their habitat." Final ROD at 30.

162.    The Final ROD does not reference specifically which guidance or what impacts on habitat would be facilitated by delaying the presence of cattle for an additional ten days. The decision only makes general references to guidance and impacts on habitat.

163.    However, based on information and belief, the USFS is referring to grass height in this justification, as all other desired conditions during this breeding and nesting season are not affected by the presence of cattle. *See id.* (Indicators include proximity of trees, proximity of sagebrush to leks, sagebrush canopy cover, sagebrush height, sagebrush shape, grass canopy cover, forb canopy cover.)

164.    Making management decisions to facilitate compliance with guidance that has been scientifically disproven is a violation of NEPA, the 2012 Forest Planning Rule, and the APA.

165.    Had the USFS complied with these laws and considered the best available science with regard to sage-grouse habitat and the seven-inch rule, it likely would not have found a need to delay the on date for these allotments by ten days.

**Monroe Mountain Aspen Ecosystems Restoration Project**

166.    Over the last decade, there has also been a large aspen regeneration project that has required livestock producers to change the way they run their operations.

167.    To incentivize these operational changes, the USFS managers told permit holders that the project would likely increase forage available for domestic ungulates. Final ROD Monroe Mountain Aspen Ecosystems Restoration Project at 50. It was expected that the increased forage on the mountain from the regeneration project would in part be passed on to the benefit of the producers by way of AUM increases.

**Measuring Use at Time of Use Instead of at End of Growing Season Violates the LRMP.**

168.    In 2001, the Fishlake National Forest amended the forage utilization section of its forest plan with a decision that established the maximum allowable forage use levels in the area.

169.    For upland grasses and forbs, that plan established a use standard of 40-60 percent of key species (varied by grazing system and desired condition). A note included in the use matrix clarifies that the 40-60 percent use standard is measured against "% of current year's growth." Fish Lake National Forest Land and Resource Management Plan, Forest Plan Amendment of Forage Utilization Standards & Guidelines p. 4. Available at

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5116139.pdf.

170.    In this decision, the USFS changed the standard of comparison from the current year's growth (meaning the entire growing season) to current growth (meaning the growing season thus far) without providing a proper rationale for the change, and without amending the LRMP.

171.    This is the same measuring bias the USFS chose to ignore when implementing the seven-inch rule with sage-grouse. The timing of grass measurement matters, and the USFS continues to ignore the fact that grass grows throughout the spring and summer even after it has been measured.

172.    Just like measuring grass height at day 15, when a sage-grouse nest failed due to predation, and comparing that to grass heights measured at day 37 when the nest hatched, this change will evaluate some grass heights at earlier stages of the growing season even though the LRMP requires that use and utilization be evaluated after the current growing season.

173.    Changing the standard from 40-60 percent end-of-season use to 50 percent real-time use will lead to the use of grass measurements that do not reflect the proper standard as

required by the LRMP.

174.    This will result in less forage being available for livestock, which is the opposite of what was assured from the aspen regeneration project.

### The "Use" and "Utilization" Conundrum

175.    In 2001, USFS amended its Fishlake Forest LRMP. The USFS amended its Forage Utilization Standards and Guidelines by establishing "Maximum Allowable Forage Use Criteria." FEIS at 11.

176.    The final environmental impact statement ("FEIS") attempts to arbitrarily bifurcate the terms "use" and "utilization," with "use" referring to the amount of current growth consumed and "utilization" referring to the amount of consumption compared to the entire growing season. *See* FEIS at 103.

177.    Since the 2001 amendment (and perhaps even before the amendment), the USFS used the words "use" and "utilization" interchangeably when discussing the proper use or utilization of forage. This is evidenced in Table 1 of the FEIS, the LRMP Amendment of Forage *Utilization* Standards and Guidelines, or the Maximum Allowable Forage *Use* Criteria. *See* FEIS at 11, Table 1 (emphasis added).

**Table 1. LRMP Amendment of Forage Utilization Standards and Guidelines**

| Maximum Allowable[2] Forage Use Criteria | | |
|---|---|---|
| **Vegetation Type** | **Stubble Height/Use** | **Comments** |
| | | |

178.    In reference to Upland Grass/Forb, the Maximum Allowable Forage Use Criteria establish a 40-60 percent use (not utilization) of the current year's growth. *Id.*

| Maximum Allowable[2] Forage Use Criteria | | |
|---|---|---|
| **Vegetation Type** | **Stubble Height/Use** | **Comments** |
| | | between pastures or off the allotment |
| Wheatgrass Seedings | 60% | Management option to exceed 60% use to maintain healthy seedings |
| Riparian/Upland Browse Sprouts and Young Aged Plants | ≤40% | # of current year's available twigs removed |
| Riparian/Upland Mature Browse | ≤50% | # of current year's available twigs removed |
| Upland Grass/Forb | 40-60% of key species; varies by grazing system and desired condition | % of current year's growth |

179.    Since the inclusion of this amendment to the LRMP in 2001, the USFS has evaluated that standard by determining "utilization" at the end of each growing season. This is supported by the "Allotment Utilization Results" found in the FEIS. *See* Tables 3, 4, 5, 7, and 9. The USFS has always taken utilization measurements at the end of the growing season.

180.    When describing the current management, the EIS correctly points out that the 2001 maximum allowable forage use criteria allows up to 60 percent "utilization" during the grazing season. FEIS at 97. It does so by referencing Table 1, which uses the word "use" when establishing the standard of 40-60 percent "of current year's growth." FEIS at 12.

181.    Before this FEIS, "use" and "utilization" were treated the same and were always measured at the end of the growing season and published in the "Allotment Utilization Results" report.

182.    However, when describing the grazing use in the FEIS, the USFS attempts to bifurcate the terms and make "use" the "current year's forage production that is consumed *at the time livestock are actively grazing*" while defining "utilization" as "the current years forage

production that is consumed *but not measured until the end of the growing season*." FEIS at 103 (emphasis added).

183.    This arbitrary bifurcation is not supported in the FEIS by any literature or rationale, and it is contradictory to the USFS's previous interpretation. The only justification offered is "Dr. Erick Thacker, personal conversation, February 2023." FEIS at 103. This is insufficient rationale to effectuate such a large change with substantial direct effects on the livestock, livestock producers, and the state and local economy. Importantly, the EIS does not describe the context of the "personal conversation," nor does it explain why the two terms mean something different in 2024, while having the same meaning for at least the previous 23 years.

184.    The bifurcation of the two terms "use" and "utilization" without proper rationale or justification is arbitrary and capricious and violates NEPA and the APA.

185.    Further, such a decision impedes the State's ability to support a robust agricultural economy in Piute and Sevier Counties.

**The Direct Effects of a 50 Percent Real-Time Use Criteria**

186.    In the Final ROD, the USFS is inconsistent with its criteria. The USFS kept the 40-60 percent "use" and "utilization" end-of-growing season standard in their LRMP, while at the same time implementing a different standard of 50 percent "real-time use" for upland grasses and forbs. Final ROD at 37.

187.    The FEIS did not discuss or explain how the two standards are consistent with or in opposition to each other, nor did the FEIS disclose the direct effects of implementing a 50 percent "real-time use" standard on the human environment.

188.    USFS failed to quantify in any way what the net loss of consumption would be, either in forage or time, to the livestock and livestock producers. SEC believes it could be as

much as a 45 percent cut in available forage for the producers.

189.     The USFS claims this reduction to be "modest" in nature but fails to quantify what that means or why it believes the reduction to be modest. Nor does the USFS identify what a change from 60 percent end-of-growing season to 50 percent real-time use would look like in terms of forage, AUMs, HMs, or time.

**The FEIS Did Not Properly Analyze 50 Percent Real-Time Use**.

190.     A season-long 50 percent real-time use standard was never discussed or analyzed in the FEIS, yet the USFS still decided to implement it in the Final ROD. Real-time use begins to show up in the EIS under the proposed action when the USFS attempts to separate "use" from "utilization" as mentioned above. FEIS at 103.

191.     However, in the proposed alternative section of the FEIS, the USFS proposed keeping the "allowable use criteria the same" (not changing to real-time use) and implementing a "proper use" criterion across the planning area of 40 percent use in the spring, 50 percent use in the summer, and 60 percent utilization in the fall. FEIS at 103-104.

192.     The adoption of a "proper use" criterion is what was evaluated under alternative 2, not the adoption of a 50 percent real-time use standard, which is what was ultimately approved under the Final ROD. These two standards are different, and while the USFS may have evaluated the proper use criteria, it did not evaluate a season-long 50 percent real-time use standard in the FEIS.

193.     It is also worth noting that the USFS uses the word "utilization" rather than "use" when describing the proposed "proper use" in this section of the FEIS, which occurs just a few paragraphs after USFS attempts to distinguish the two terms, acknowledging that Alternative 2 was considering the end of season utilization standards.

194.    The only alternative that considers measuring forage in real-time, or upon exit from the pasture, for the entire season was Alternative 3, which considered a 30 percent real-time use standard. FEIS at 112.

195.    However, in considering the adverse economic impacts to livestock grazing in Alternative 3, there is little mention of the effects on forage consumption, or the economics associated with a 30 percent real-time use standard. FEIS at 209. Neither is there any data that quantifies the amount of forage lost after the transition from use and utilization (end-of-season measurements) to real-time use (measuring upon exit from the pasture, not accounting for re-growth).

196.    There is no specific discussion about the direct and indirect effects of real-time use measurements. The analysis simply states that "[w]ith reduced access to federal forage, many producers may be forced to reduce their herd size or cease livestock production altogether." *Id.* And that statement was about a 30 percent real-time use standard, not the 50 percent real-time use standard that was ultimately adopted. Nowhere in the FEIS or the ROD are there any analyses of the potential impacts of a season long 50 percent real-time use standard. It was not within the range of any alternative.

197.    The USFS adopted a standard that was outside the range of alternatives considered in its FEIS, in violation of NEPA.

198.    Additionally, the FEIS did not provide a full and fair discussion of the significant impacts to the human environment from changing the standard of use and utilization to real-time use.

199.    The direct effects on the permit holders, the Counties, and the State resulting from moving from a 40-60 percent end-of-season utilization measurement to a 50 percent real-time

use measurement were not fairly or fully discussed in the FEIS. *See* FEIS at 169-171.

200.    The change from end-of-growing season utilization to real-time use was capricious, was not supported by a rational explanation, and the direct effects to the livestock producers and the Plaintiffs were not properly disclosed.

201.    Additionally, a real-time use standard is inconsistent with the Maximum Allowable Forage standards imposed by the LRMP.

**The Influence of Beavers on Riparian Areas**

202.    Plaintiff Counties contracted with an environmental consultant to evaluate the riparian health of the planning area.

203.    The environmental consultants found that many of the riparian areas in the planning area were transitioning in type from a beaver-dam controlled system to a more restrictive cobbled/bouldered/sand gravel stream system.

204.    Historically, beavers were a more significant part of the Monroe Mountain ecosystem. Over the last several decades, however, there has been a beaver exodus across the mountain.

205.    The loss of the beaver population has left hundreds of unmaintained beaver dams in the riparian areas within Monroe Mountain.

206.    More recently these beaver dams have begun to fail due to water backup and lack of maintenance.

207.    When a beaver dam fails, the backed-up water rushes through the failed section of the beaver dam and causes down-carving or stream channeling in the stream bed.

208.    Because there are no new beaver dams further downstream to slow down the water run, the water continues to run at a faster rate than it would with maintained beaver dams.

209.    The increased flow of water from failed beaver dams has caused the riparian areas to transition from a beaver-dam controlled flooding riparian area to a cobbled/bouldered/sanded gravel stream.

210.    This means that water is restricted in a stream rather than saturating soils in a flooded area.

211.    The environmental consultant's report found that as a result, riparian areas on Monroe Mountain are experiencing this transition and have begun to decrease in size, and that this is a natural process.

212.    The environmental consultants further determined that a proper evaluation of the riparian areas must acknowledge the natural transition and the natural shrinking of the riparian system.

213.    Here, the USFS failed to acknowledge the natural transition and natural shrinking of the riparian areas when considering the effects that livestock grazing would have on riparian areas. The USFS evaluated riparian systems that are now restricted to the stream bed as if they were still beaver dam-controlled flooding systems. This led to an inaccurate determination that several riparian systems were not meeting standards.

214.    When the environmental consultants evaluated the riparian systems acknowledging the natural changes, the vast majority of the evaluations indicated a functioning riparian system.

215.    These evaluations were shared with the USFS, both in draft form and later as a final report, along with the raw data.

216.    The USFS was aware of the transition occurring in the riparian systems on the southern Monroe Mountain but never made any changes to the riparian determinations as was

suggested in the consultants' report, nor did the USFS consider this information in their analysis.

217.    This led to several alleged determinations of riparian systems not meeting standards. As a result of these determinations, the USFS changed management directives in the areas that were allegedly not meeting riparian standards.

### Moving from 4- to 6-inch Stubble Height.

218.    The USFS, guided by an inaccurate determination, decided to manage for a six-inch stubble height in these emphasis areas ("riparian pastures") rather than the standard four-inch stubble height as was established by the 2001 LRMP amendment.

219.    Under the 2001 Forest Plan Amendment, Riparian Hydric Species were managed to a 4-inch stubble height. However, Riparian Emphasis Management Areas were managed to a 6-inch stubble height. Fish Lake National Forest Land and Resource Management Plan, Forest Plan Amendment of Forage Utilization Standards & Guidelines p. 4. Available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5116139.pdf.

220.    Had the USFS properly considered the riparian information provided to it by SEC and the Counties, the "riparian pasture" areas would likely have been found to be stable and functioning. Such a finding would have allowed the "riparian pastures" to be managed as normal riparian areas with a stubble height standard of four inches, rather than the six-inch standard associated with emphasis riparian areas.

221.    Additionally, by failing to incorporate the data provided to the USFS through Piute and Sevier County's consultants, the USFS violated NEPA by failing to take the necessary "hard look" at the impacts on riparian areas.

### 1.5 Inch Non-hydric Sod-Forming Grass Species in Riparian Areas

222.    Another critical error was made by the USFS as it again approved standards that

were inconsistent with the LRMP.

223.    The Final ROD approved a new and conflicting standard for the utilization of non-hydric sod-forming grass species in riparian areas. While the LRMP imposes a 1.5-inch stubble height for these types of grasses, the Final ROD changes that to a four to six-inch standard in most areas, with a six-inch standard in others.

224.    This is particularly troublesome because, as explained by the LRMP, these types of grasses are "primarily Kentucky bluegrass," and common knowledge is that Kentucky bluegrass does not generally grow four inches in that area. *Id.*

225.    Not only was the change from 1.5 inches to four-to-six inches inconsistent with the LRMP, it was also never analyzed in the FEIS. The FEIS compares the different alternatives analyzed in the FEIS. The "Utilization of Non-hydric Sod Forming Grass Species in Riparian Areas" matrix shows that only a 1.5-inch standard was ever considered or evaluated in the FEIS. FEIS at 122.

226.    Because it was never considered in the FEIS, the direct and indirect effects were never disclosed, and the public never had an opportunity to comment on the proposal.

227.    The Final ROD should have been consistent with the LRMP, and on this particular point (as well as the use and utilization point), the Final ROD implements a standard that is inconsistent with the LRMP.

228.    Additionally, the Final ROD approved a standard that was never considered in any of the alternatives in the EIS. This is a violation of NEPA.

**Decisions Left to the Discretion of the Forest Supervisor.**

229.    In accordance with the LRMP, certain management decisions are left to the discretion of the Forest Supervisor.

230.    This discretion is authorized through federal regulation, as well as through the grazing permit itself.

231.    For example, the decision to require livestock producers to place an extra forest service ear tag in their cattle's ears is a discretionary decision made at the forest level by each forest supervisor.

232.    It is not a decision that needs to go through an environmental analysis because it does not affect the environment.

233.    This EIS removes the forest supervisor's discretion and mandates that certain activities (such as requiring additional ear tags) and certain procedures take place no matter what.

234.    If the forest supervisor changes his mind, or if a future forest supervisor desires a different approach, their discretion is removed and, absent a new EIS, they would be unable to exercise that discretion.

235.    These types of decisions are ultra vires and beyond the authority of this decision.

## FIRST CAUSE OF ACTION

**Violation of NEPA and the 2012 Planning Rule: Failure to use the best available science and ensure scientific integrity concerning grass heights needed for sage-grouse nesting.**

236.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

237.    When considering the effects of livestock grazing on sage-grouse and sage-grouse habitat, the USFS ignored the best available science regarding the suggested droop height requirements for sage-grouse nesting.

238.    The USFS did not "make use of reliable existing data" regarding sage-grouse nesting habitat, as is required by NEPA regulations. 40 C.F.R. § 1502.23.

239.    Neither did "the responsible official [make] use of the best available scientific information to inform the planning process" as is required by the 2012 Planning Rule. 2012 Planning Rule § 219.3.

240.    The USFS was presented with peer-reviewed and industry-accepted science that debunked the "seven-inch rule" that was part of the 2015 LRMP amendment.

241.    However, the USFS ignored this science and continued to make decisions regarding sage-grouse habitat, and the effects of livestock grazing on that habitat, based on the faulty and debunked "seven-inch rule."

242.    The USFS decided "to change the Kingston/Forshea "on date" from June 6th to June 16th to facilitate more certain compliance with sage-grouse LRMP guidance and to help reduce impacts to sage-grouse and their habitat." Final ROD at 30. The compliance and guidance referenced in the Final ROD are based on the debunked "seven-inch rule."

243.    The USFS also decided not to authorize an immediate increase of 261 HMs on the Kingston/Forshea allotment that would have corrected an errant conversion from sheep to cattle in 1992. As part of the justification for this decision, the USFS noted that in "2022, on the Forshea Allotment, the average droop height was 6 inches (less than the 7-inch criteria for sage-grouse)." *Id.* at 50. "[A]nd on the Kingston Allotment, several pastures were right at the [7-inch] criteria." *Id.* at 51. These observations influenced the USFS's decision not to authorize an immediate increase on the Kingston and Forshea allotments. *Id.*

244.    Again, the USFS is making grazing authorization decisions based, at least in part, on debunked scientific criteria. Furthermore, the USFS is aware of the bad science, has been presented with the proper science, and has nonetheless chosen to continue making decisions based on the errant scientific data.

245.    The USFS's decision to ignore the best available scientific information when informing decision-making about grazing authorization in sage-grouse habitat violates NEPA and the 2012 Planning Rule and impedes the State of Utah's ability to balance and support both a robust agricultural economy and a robust wildlife industry.

## SECOND CAUSE OF ACTION

**Violation of NEPA, APA, and the Fishlake National Forest LRMP through arbitrary and capricious changes.**

246.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

247.    The purpose of an EIS is to "provide a full and fair discussion of significant environmental impacts" including impacts on the "human environment." 40 C.F.R. § 1502.1; 42 U.S.C.A. § 4332(C).

248.    In 2001, the Fishlake National Forest amended the Forage Utilization Standards and Guidelines section of their LRMP to include Maximum Allowable Forage Use Criteria. FEIS at 11.

249.    The Final ROD affirmatively "determined a LRMP amendment is not required as part of this project[.]" Final ROD at 52.

250.    However, the decision implements a different standard than what is prescribed in the LRMP. The LRMP imposes that forage utilization and/or use shall be 40-60 percent of the current year's growth for upland grass. The Final ROD changes from the prescribed 40-60 percent of current year's growth to less than or equal to 50 percent at time of use without amending the LRMP, or even considering the change in any of the analyzed alternatives in the FEIS.

251.    These two standards are not compatible and can be in opposition to one another.

A spring pasture can be grazed to 50 percent of existing growth, cattle removed, and as the grass continues to grow, and at the end of the growing season be significantly less than the 40 percent standard expressed in the LRMP.

252.    This juxtaposition was not properly considered in the EIS. There is no attempt in the analysis to determine whether this new standard will comply with the LRMP.

253.    Further, there were no proper analyses or disclosures of the direct and indirect effects of the new standard on livestock or livestock producers because the new standard was not fully or fairly analyzed in any of the alternatives considered in the FEIS.

254.    Additionally, implementation of this new standard places permit holders on the southern half of the Monroe Mountain in a disadvantaged position with respect to every other permit holder in the forest. These six allotments will have to comply with forage consumption standards different and apart from the standards in the rest of the forest.

255.    The FEIS never gives a full and fair discussion as to why these six allotments deserve a different, more restrictive, standard of forage consumption than the rest of the forest.

256.    The FEIS failed to properly discuss any rationale for moving away from the LRMP standard of 40-60 percent use and utilization (end of growing season or current year's growth) and implementing a 50 percent real-time use standard (measured at the time of exit from pasture).

257.    The FEIS did not properly disclose the direct and indirect impacts to the livestock and livestock producers or attempt to quantify the loss in forage and time that this new standard would impose. Neither did the FEIS offer any rationale or justification for placing these six allotments on a different, more restrictive standard than the rest of the forest.

258.    Thus, the USFS violated NEPA, the APA, and their own LRMP by arbitrarily

imposing this new forage consumption standard without amending the LRMP.

<h2 style="text-align:center"><u>THIRD CAUSE OF ACTION</u></h2>

**Violation of NEPA: the Final ROD incorporated a 50 percent real-time use standard that was outside the range of alternatives considered in the EIS and thus never went through the "Hard Look" standard required by NEPA.**

259.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

260.    NEPA requires agencies to take a "hard look" at the environmental consequences of their proposed actions.

261.    Before an agency can decide to implement an action, it must first disclose that action and describe the environmental impacts associated with it.

262.    This is done by expressing a range of alternatives. The range of alternatives sets the sideboards of the decision to be made, and the decision maker must make a decision within those sideboards. Decision makers cannot make a decision that was not considered in the FEIS.

263.    The USFS never provided a range of alternatives for analysis that included a season long 50 percent real-time use standard. The FEIS only considered one potential standard for a season long real-time use, and that was a 30 percent real-time use standard. Yet the USFS ultimately adopted a 50 percent real-time use standard.

264.    The FEIS only considered a 40-60 percent use and utilization standard; a 40 percent spring use, 50 percent summer use, and 60 percent fall utilization standard; and a 30 percent real-time use standard. Thus, it was impermissible to adopt a 50 percent season long real-time use standard because it fell beyond the sideboards put in place by the proposed alternatives.

265.    The USFS violated NEPA by failing to include in its FEIS the 50 percent season long real-time use standard that it ultimately adopted in the Final ROD.

## FOURTH CAUSE OF ACTION

**Violation of NEPA and the LRMP: The USFS adopted a riparian pasture standard that was never considered in the FEIS and is inconsistent with the LRMP.**

266.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

267.    Without consideration in the FEIS, and in conflict with the LRMP, the USFS changed the non-hydric sod-forming grass stubble height standard from 1.5 inches to four-to-six inches in its Final ROD.

268.    The 2001 amendment to the Fishlake National Forest LRMP identifies a stubble height of 1.5 inches for Non-hydric Sod-Forming Grass Species.

269.    The Final ROD changed the stubble height for non-hydric sod-forming grass species from 1.5 inches to four-to-six inches without any justification or rationale. This change was never considered in the FEIS, nor was the LRMP ever amended.

270.    The new standard is not only inconsistent with the LRMP, but it is also a violation of NEPA as it was never considered in the FEIS.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant relief against Defendants as follows:

271.    Declare and set aside the Final ROD as unlawful and find that the Defendants acted arbitrarily, capriciously, and beyond their statutory authority by ignoring current and industry-accepted science and continuing to impose improper management standards for sage-grouse nesting habitat.

272.    Declare and set aside the Final ROD as unlawful and find that the Defendants acted arbitrarily and capriciously by making managerial decisions for the authorization of

livestock grazing based on sage-grouse standards the Defendants know to be inaccurate and refusing to implement the proper sage-grouse standard.

273.    Declare and set aside the Final ROD as unlawful and find that the Defendants failed to comply with NEPA and Planning Rule requirements to use existing available data and ensure scientific integrity in the planning process by failing to include and analyze the sage-grouse habitat grass height science with which it was presented.

274.    Declare and set aside the Final ROD as unlawful and find that the Defendants failed to comply with NEPA and their own LRMP by imposing a new conflicting forage consumption standard and stubble height requirements on these six allotments without considering them in any of the alternatives in the FEIS and without properly amending the LRMP, and that the new standards place the permit holders on these allotments in a disadvantaged position as it relates to the other permit holders in the forest by forcing them to comply with a more restrictive forage consumption standard than the rest of the forest.

275.    Declare and set aside the Final ROD as unlawful and find that the Defendants failed to comply with the NEPA mandate to give a full and fair discussion of the direct and indirect impacts of the proposed action on the environment, including the human environment.


Respectfully submitted this 10th day of February, 2025.


UTAH ATTORNEY GENERAL'S OFFICE

*/s/ K. Tess Davis*
Kathy A.F. Davis
K. Tess Davis
J. Shea Owens

*Attorneys for Plaintiffs*